**KEY PHARMACEUTICALS,**
Plaintiff–Appellee,

v.

**HERCON LABORATORIES CORPORATION, Defendant–Appellant.**

Nos. 98–1067, 98–1180.

United States Court of Appeals,
Federal Circuit.

Nov. 25, 1998.

Rehearing Denied Jan. 8, 1999.

John O. Tramontine, Fish & Neave, New York, New York, argued for plaintiff-appellee. With him on the brief were Duane-David Hough, Thomas J. Vetter, and Thomas P. Burke.

Kenneth R. Adamo, Jones, Day, Reavis & Pogue, Cleveland, Ohio, argued for defendant-appellant. With him on the brief were Gregory A. Castanias and Blaney Harper, Washington, DC. Of counsel on the brief were Bruce M. Schloss, Health-chem Corp., New York, New York; Sheldon I. Landsman, Sughrue Mion Zinn Macpeak & Seas, PLLC, Washington, DC; and Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunell, Wilmington, Delaware.

Before MAYER, Chief Judge, PLAGER and CLEVENGER, Circuit Judges.

PLAGER, Circuit Judge.

This is an appeal from a patent infringement action in which Key Pharmaceuticals, Inc. ("Key") charged Hercon Laboratories Corporation ("Hercon") with infringement of its U.S. Patent No. 5,186,938 ("'938 patent" or "the patent"). Hercon, in addition to denying infringement, counterclaimed that the patent is invalid and unenforceable. Following a bench trial, the United States District Court for the District of Delaware concluded that Hercon infringed the patent and that it failed to prove the patent invalid or unenforceable, and entered a final judgment to that effect. *See Key Pharm., Inc. v. Hercon Lab. Corp.*, 981 F.Supp. 299 (D.Del.1997). Hercon appeals the judgment on its invalidity and unenforceability counterclaims. We affirm.

## BACKGROUND

Key manufactures and sells a nitroglycerin transdermal patch known as the Nitro-Dur II for treating angina pectoris due to coronary artery disease. The Nitro-Dur II patch consists of an impermeable plastic backing layer to which is laminated an adhesive layer having nitroglycerin dispersed therein. The "drug-in-adhesive" patch is applied to a patient's skin, and is designed to deliver nitroglycerin through the skin over a twenty-four hour period. The Nitro-Dur II is Key's purported commercial embodiment of the '938 patent, entitled "Adhesive Transdermal Dosage Layer."

Hercon is a generic drug manufacturer seeking to manufacture and sell a generic version of the Nitro-Dur II. This dispute arose when Hercon applied for Food and Drug Administration ("FDA") approval of its generic patch. Key sued Hercon, alleging that Hercon had infringed the '938 patent by submitting applications for FDA approval, and seeking to enjoin Hercon from manufacturing and selling its generic patch.

In response, Hercon asserted that its generic patch does not infringe and that the patent is invalid and unenforceable. Key ultimately limited its infringement charge to claim 14 of the '938 patent. Hercon, as part of its invalidity case, argued that claim 14 is anticipated and rendered obvious by, among other things, Japanese Kokai 46959-1983, a prior-art Japanese published patent application (hereafter the "'959 reference" or "'959 Japanese patent application").

Within the context of transdermal patches, the '938 patent, the patent-in-suit, is directed generally to the adhesive layer, namely, an "adhesive transdermal dosage layer" that contains a "pharmaceutically active drug" dispersed in the adhesive layer. '938 patent, col. 3, ll. 39-43. The adhesive layer is placed on a backing or "facing" layer to form a transdermal patch. *Id.* col. 4, ll. 18-26. The adhesive layer includes, intermixed, an adhesive acrylate polymer, a cross-linking agent, and a pharmaceutically active drug that by itself, or as dissolved in a solvent, acts as a solvent with respect to the adhesive polymer. *See id.* col. 3, ll. 39-51. The patent teaches that a sufficient amount of drug must be added to the adhesive layer for it to be "pharmaceutically effective." *Id.* col. 3, ll. 43-48. However, according to the patent, as more solvent-acting drug is added, the adhesive polymer becomes "soft and runny." *Id.* col. 3, ll. 54-64. To offset this solvent effect,

the cross-linking agent is added. *See id.* col. 3, l. 54, to col. 4, l. 5.

Claim 14, the only claim at issue, is a dependent claim, depending on claim 13, which in turn depends on claim 12, an independent claim. Claim 12 specifies an adhesive layer comprising a cross-linked acrylate polymer and a pharmaceutically active drug:

> 12. An adhesive transdermal layer for sustained release of a pharmaceutically active drug to the skin of a human patient, comprising:
>
> a pharmaceutically active drug-containing essentially planar sheet of an at least partially cross-linked acrylic adhesive, said essentially planar sheet comprising a flexible self-supporting cross-linked acrylate polymer of sufficient adhesivity, durability and strength whereby intimate diffusional contact with skin of the patient is maintained for a period of at least about 24 hours *without destruction of the physical integrity thereof,* said essentially planar sheet being capable of retaining dispersed therein *sufficient pharmaceutically active drug to deliver to the skin a pharmaceutically effective amount of said pharmaceutically active drug over a 24–hour time interval,* without dissolution of the at least partially cross-linked acrylic pressure-sensitive adhesive.

*Id.* col. 12, ll. 5–23 (emphasis added).

Whereas claim 12 is directed to adhesive layers containing "pharmaceutically active drug[s]" generally, claim 13 limits claim 12 by requiring that the "pharmaceutically active drug" be a "vasodilator," and claim 14 in turn limits claim 13 by requiring that the vasodilator be "nitroglycerin." *Id.* col. 12, ll. 24–28.

At trial, the question of the validity of claim 14 over the '959 reference turned principally on the proper construction of the claim clause "sufficient pharmaceutically active drug [nitroglycerin, in the case of claim 14] to deliver to the skin a pharmaceutically effective amount of said pharmaceutically active drug [nitroglycerin] over a 24–hour time interval." The primary dispute was whether the '959 reference disclosed a transdermal patch capable of delivering such an amount of nitroglycerin. At Hercon's urging at trial,

the trial court construed the clause based on the range of nitroglycerin dosages conditionally approved by FDA in 1984, *i.e.,* 2.5 to 15 milligrams per day ("mg/day"), *see Key Pharm.,* 981 F.Supp. at 307–10; the year 1984 relates to the '938 patent in that the patent issued from a series of continuing applications, the first of which was filed in that year. Specifically, the court construed the clause to mean "an amount sufficient to provide a patient with 2.5 to 15 mg of nitroglycerin per day—that is, 2.5 to 15 mg of nitroglycerin, plus an excess amount to ensure that the desired amount is delivered." *Id.* at 310. Based on this claim construction, and upon rejecting Hercon's other arguments, the court found that Hercon had failed to prove by clear and convincing evidence that the '959 reference anticipates or renders obvious claim 14. *See id.* at 311–13.

Hercon's unenforceability counterclaim was also based in large part on the '959 reference. During the prosecution that led to the issuance of the '938 patent, Key submitted to the U.S. Patent and Trademark Office ("PTO") only the English-language *abstract* of the '959 Japanese patent application. Hercon argued that Key committed inequitable conduct by failing to submit the English-language translation of the *complete* '959 Japanese patent application.

As found by the trial court, the '959 reference discloses a transdermal acrylic adhesive layer, at least partially cross-linked, for administering a drug through the skin. *See id.* at 311. The abstract of the '959 reference, which was submitted to the PTO, describes an adhesive transdermal formulation containing an adhesive polymer, cross-linking agents, and a solvent drug; the abstract however does not mention any specific drug. The complete '959 Japanese patent application, on the other hand, discloses nitroglycerin as one suitable drug, and provides a specific example, "Example 3," in which 40 milligrams ("mg") of nitroglycerin are contained in a cross-linked acrylic adhesive layer in a 100 square-centimeter ("cm$^2$") patch.

The trial court found that Hercon failed to establish the threshold levels of materiality and intent required for inequitable conduct,

*see Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439, 17 USPQ2d 1834, 1839 (Fed.Cir.1991), and thus determined that "Hercon has not established by clear and convincing evidence that Key's actions constituted inequitable conduct." *Key Pharm.*, 981 F.Supp. at 317–19. In reaching this decision, the trial court concluded that "Key's failure to present to the PTO anything more than the abstract[ ] for the ['959 Japanese patent application] does not satisfy the threshold level of materiality required for an inequitable conduct inquiry." *Id.* at 317. With regard to intent, the trial court found that the evidence was not such "from which one can clearly infer a deceitful motive," noting that "Hercon produced no evidence that suggests that [the prosecuting patent attorney] did not believe that he had appropriately brought the ['959 reference] to the attention of the PTO by submitting the abstract[ ]." *Id.* at 319.

Here on appeal Hercon asserts that the trial court erred in not finding the '938 patent invalid or unenforceable based on the '959 reference. Hercon does not challenge the infringement finding or any other aspects of the judgment.

## DISCUSSION

### I.

With regard to validity, Hercon argues that claim 14 of the '938 patent is anticipated or rendered obvious by the '959 reference, and that the trial court's contrary conclusions are in error. Hercon's appeal in this regard hinges largely on claim construction, namely, the proper construction of the clause "sufficient pharmaceutically active drug [nitroglycerin, in the case of claim 14] to deliver to the skin a pharmaceutically effective amount of said pharmaceutically active drug over a 24–hour time interval." Hercon argues that the trial court's construction of this clause is wrong, even though it urged that construction at trial. Key, for its part, asserts that the construction is absolutely right, though it opposed the construction at trial.

■ Our standard of review of claim construction is now firmly established: we exercise independent review. *See Cybor Corp. v.*

*FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981, 34 USPQ2d 1321, 1331 (Fed. Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). However, we do not start from scratch; rather we begin with and carefully consider the trial court's work. *See Cybor*, 138 F.3d at 1462–63, 46 USPQ2d at 1179–81 (Plager and Bryson, JJ., concurring separately).

In construing the disputed claim clause, the trial court relied heavily on the testimony of Hercon's technical expert, Dr. Richard H. Guy, a Ph.D. in pharmaceutical chemistry. Dr. Guy explained that for a transdermal patch to be effective, it should produce and sustain a concentration of the drug in the blood that falls within a range referred to in the art as "the therapeutic window," at the low end of which the drug is minimally effective and at the high end is minimally toxic. Tr. at 1093–94. He testified that the term "pharmaceutically effective amount" refers to the amount of drug, *e.g.*, in milligrams, required over a twenty-four hour period to produce and sustain a drug concentration within the therapeutic window. Tr. at 1096.

With regard to claim 14, he stated that the phrase refers to "the amount of nitroglycerin required in a day to achieve the sustained concentration." Tr. at 1097. When Hercon's counsel asked Dr. Guy whether "anything in the specification or claims or file history of the '938 patent ... would lead [him] to come to a different conclusion as to the meaning of 'pharmaceutically effective amount ...' as used in claim 14," Dr. Guy replied, "No." *Id.*

Hercon's counsel then directed Dr. Guy's testimony to specific numerical values encompassed by the term "pharmaceutically effective amount." In response to questioning by Hercon's counsel, Dr. Guy testified that the patent provides no numerical values for the term, that one of ordinary skill in the art would therefore look to the FDA for numerical ranges, and that there one would find the range 2.5 to 15 mg of nitroglycerin per day:

Q. Does the '938 patent provide any numerical values for what is meant by "a pharmaceutically effective amount"?

A. No.

Q. If the '938 patent doesn't provide any numerical values, what, then, would one of ordinary skill in the art use as a pharmaceutically effective amount?

A. As one of ordinary skill in the art in the area of transdermal delivery, at—in 1984, let's say, the information which is available to one concerning the pharmaceutically effective amount of nitroglycerin over a period of 24 hours would—I would look to the conditionally approved FDA— or conditionally approved by the FDA transdermal delivery systems for guidance on that number.

Q. And looking there for guidance, what amounts would that lead you to?

A. .... [T]he conditionally approved systems teach you between 2.5 and 15 milligrams per day as being a range which at that time by the FDA were thought to be pharmaceutically effective.

Tr. at 1097–99. In sum then, Dr. Guy opined that one of ordinary skill in the art at the time of the claimed invention would have construed the phrase "a pharmaceutically effective amount [of nitroglycerin]" to mean an amount falling within the range delivered by the nitroglycerin patches conditionally approved by the FDA in 1984—the earliest effective date for the '938 patent—i.e., 2.5 to 15 mg/day.

The trial court's claim construction essentially tracks Dr. Guy's testimony. As already noted, the court construed the clause to mean "an amount sufficient to provide a patient with 2.5 to 15 mg of nitroglycerin per day—that is, 2.5 to 15 mg of nitroglycerin, plus an excess amount to ensure that the desired amount is delivered." *Key Pharm.,* 981 F.Supp. at 310.

The disputed claim clause actually refers to two interrelated amounts: the amount of drug contained in the adhesive layer (*i.e.,* "sufficient pharmaceutically active drug"), and the amount of drug delivered to the patient (*i.e.,* "a pharmaceutically effective amount"). *See* '938 patent, col. 12, ll. 16–21, 24–28 ("said [adhesive layer] being capable of retaining dispersed therein *sufficient pharmaceutically active drug* [nitroglycerin, in the case of claim 14] to deliver to the skin *a pharmaceutically effective amount* of said pharmaceutically active drug over a 24–hour time interval"). The trial court's claim construction addressed each of these amounts: the court construed the phrase "a pharmaceutically effective amount"—the amount delivered to the patient's skin—as 2.5 to 15 mg of nitroglycerin per day, and the phrase "sufficient [nitroglycerin]"—the amount in the adhesive layer—as an amount in excess of 2.5 to 15 mg of nitroglycerin to ensure that 2.5 to 15 mg of nitroglycerin are delivered to the patient. *See Key Pharm.,* 981 F.Supp. at 310.

■ Hercon's appeal is directed specifically to the construction of the phrase "a pharmaceutically effective amount," *i.e.,* the amount of nitroglycerin delivered to the patient, and Key agrees that that is the principal claim construction issue. The parties dispute the particular numerical range encompassed by the phrase "a pharmaceutically effective amount," and they present the dispute as one of claim construction. We observe in passing that, not unlike a determination of infringement, a determination of anticipation, as well as obviousness, involves two steps. First is construing the claim, a question of law for the court, followed by, in the case of anticipation or obviousness, a comparison of the construed claim to the prior art. This comparison process involves fact-finding, and is for the fact-finder in the first instance. *See Beachcombers, Int'l, Inc. v. WildeWood Creative Prods., Inc.,* 31 F.3d 1154, 1160, 1163, 31 USPQ2d 1653, 1658, 1660 (Fed.Cir.1994); *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047, 34 USPQ2d 1565, 1567 (Fed.Cir.1995). In the circumstances before us, we review the dispute in the manner it is presented to us by the parties.

### A.

■ The dispute presented to us is not one that typically is brought before an appellate court. We find highly questionable Hercon's assertion on appeal that the trial court erred when it adopted the very construction Hercon urged upon the court through the testimony of Dr. Guy. In essence, Hercon

asserts that the trial court erred by adopting the position it advocated at trial. Although the function of an appellate court is to correct errors committed at trial, we look with extreme disfavor on Hercon's assertion that the trial court committed error in its claim construction. Ordinarily, doctrines of estoppel, waiver, invited error, or the like would prohibit a party from asserting as "error" a position that it had advocated at the trial.[1]

Allowing parties in a patent suit to assert "error" in such situations would open the door to mischief and judicial inefficiency. For example, a party could advocate a certain claim construction at trial believing that that claim construction will result in favorable resolution of infringement or validity issues. If the trial court adopts that claim construction but resolves the infringement or validity issues unfavorably, the party could thereafter assert a new claim construction to get the proverbial "second-bite," possibly necessitating a retrial.

This is a case in point. At trial, Hercon's witness, Dr. Guy, proposed the 2.5 to 15 mg/day claim construction with the belief that the Example 3 patch of the '959 reference delivered an amount of nitroglycerin within this range and therefore anticipated claim 14. *See* tr. at 1104. However, on cross-examination Dr. Guy conceded that he had erred in his calculations regarding Example 3. *See Key Pharm.*, 981 F.Supp. at 312. In post-trial briefing, Hercon then contended that the remaining unimpeached evidence indicated that the Example 3 patch

delivers 2.0 mg of nitroglycerin per day. *See id.*

Concurrently, in an obvious attempt to salvage its invalidity case, Hercon offered an alternative claim construction under which the lower limit of "a pharmaceutically effective amount" is 1.5 mg of nitroglycerin per day. *See* Hercon's Opening Post–Trial Br. at 62–63. On appeal, it is this alternative claim construction (discussed below) that Hercon aggressively asserts, seeking to disavow the claim construction it urged at trial through Dr. Guy. In this case, we see no reason for Hercon's claim construction reversal other than its desire to escape Dr. Guy's erroneous calculations regarding Example 3. Such a reason does not justify an after-trial attempt to disavow a claim construction urged upon the trial court as correct. Absent a justifiable reason for such a claim construction shift, the doctrines of law to which we have referred should bar parties from fundamental changes in positions asserted at trial.

The impropriety of asserting a position which the trial court adopts and then complaining about it on appeal should be obvious on its face, and litigants hardly need warning not to engage in such conduct. Indeed, we could appropriately refuse to entertain Hercon's appeal on the issue of claim construction.

It is the case, though, that we have not found any prior opinion of this court that has had occasion to publicly condemn this behavior.[2] Nor did Key object to the conduct by

---

1. *See Yniguez v. State of Ariz.*, 939 F.2d 727, 738–39 (9th Cir.1991) (explaining that the "doctrine of judicial estoppel ... is invoked to prevent a party from changing its position over the course of judicial proceedings when such changes have an adverse impact on the judicial process," and applying the doctrine to prohibit a litigant from asserting on appeal a contrary position on a legal issue after having persuaded the trial court to adopt its prior position on the issue (citations omitted)); *Data General Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed.Cir.1996) ("Judicial estoppel is designed to prevent the perversion of the judicial process ... to protect the courts rather than the litigants."); 18 Susan Bandes & Lawrence B. Solum, *Moore's Federal Practice* § 134–30, at 134–63 (3d ed.1998) (noting that the doctrine of judicial estoppel has been applied broadly to prevent a party from adopting inconsistent legal positions in the same or related judicial proceedings); 18 Charles A. Wright et al., *Feder-*

*al Practice and Procedure* § 4477, at 786 (1981) (noting the general rule forbidding a total change of legal position on appeal); 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2558, at 470 (2d ed. 1995) ("The [invited error] rule, which is a branch of the doctrine of waiver, holds that 'a party may not complain on appeal of errors that he himself invited ....'" (citation omitted)); *Weinar v. Rollform Inc.*, 744 F.2d 797, 809, 223 USPQ 369, 376 (Fed.Cir.1984) (alleged error by trial court in failing to give interrogatories to jury was "invited error" not subject to consideration on appeal); Fed.R.Civ.P. 51 (in jury cases "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto ...").

2. *But cf. Sage Prods., Inc. v. Devon Indus., Inc.* 126 F.3d 1420, 1426, 44 USPQ2d 1103, 1108

Hercon, or seek to invoke estoppel or the other principles to which we have referred. In an abundance of fairness, then, and to preclude any argument by Hercon that it was not on notice, we choose instead to independently review the correctness of the trial court's claim construction. We do not take our task lightly in this regard, as we recognize the national *stare decisis* effect that this court's decisions on claim construction have. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ("treating [claim] interpret[ion] issues as purely legal will promote (though it will not guarantee) intrajurisdictional certainty through the application of *stare decisis* on those questions not yet subject to interjurisdictional uniformity under the authority of the single appeals court"); *Cybor,* 138 F.3d at 1455, 46 USPQ2d at 1174 (noting that in *Markman* "the Supreme Court endorsed this court's role in providing national uniformity to the construction of a patent claim").

### B.

■ Turning then to the propriety of the trial court's claim construction, Hercon's principal argument is that the court erred in relying on so-called extrinsic evidence, *i.e.,* evidence outside of the "patent record," *see Markman,* 52 F.3d at 980, 34 USPQ2d at 1330 ("Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treaties."). This court has made strong cautionary statements on the proper *use* of extrinsic evidence, *see Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1577 (Fed.Cir.1996), which might be misread by some members of the bar as restricting a trial court's ability to *hear* such evidence. We intend no such thing. To the contrary, trial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues, and trial courts have broad discretion in this regard. *See Mark-*

*man,* 52 F.3d at 980–81, 34 USPQ2d at 1330–31 ("The court may, in its discretion, receive extrinsic evidence .... for the court's understanding of the patent...."); *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1373, 47 USPQ2d 1732, 1737 (Fed.Cir.1998) (extrinsic evidence "always may be admitted by the trial court to educate itself about the patent and the relevant technology ..."); *cf. General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 515, 517, 139 L.Ed.2d 508 (1997) (holding that decision to admit or exclude expert testimony is reviewed under the abuse of discretion standard).

■ Furthermore, a trial court is quite correct in hearing and relying on expert testimony on an ultimate claim construction question in cases in which the intrinsic evidence (*i.e.,* the patent and its file history—the "patent record") does not answer the question. *See Vitronics,* 90 F.3d at 1584, 39 USPQ2d at 1578 ("No doubt there will be instances in which intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims, and in those instances, extrinsic evidence ... may ... properly be relied upon to understand and construe the claims.").

■ What is disapproved of is an attempt to use extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent. *See Markman,* 52 F.3d at 981, 34 USPQ2d at 1331 (extrinsic evidence may not be used "for the purpose of varying or contradicting the terms in the claims"); *Vitronics,* 90 F.3d at 1584, 39 USPQ2d at 1578. Thus, if the meaning of a disputed claim term is clear from the intrinsic evidence—the written record—that meaning, and no other, must prevail; it cannot be altered or superseded by witness testimony or other external sources simply because one of the parties wishes it were otherwise. *See id.* Competitors are entitled to rely on the public record of the

(Fed.Cir.1997) (declining to consider new infringement arguments raised for the first time on

appeal).

patent, and if the meaning of the patent is plain, the public record is conclusive.

■ Hercon contends that the trial court's construction of the phrase "a pharmaceutically effective amount" violates this prohibition. According to Hercon, the patent itself defines this amount as being as low as 1.5 mg of nitroglycerin per day and that it was therefore improper to rely on FDA values—evidence extrinsic to the patent record—to reach a contrary lower limit. Hercon points to the "OBJECTS OF THE INVENTION" set forth in the patent's written description in which it is stated that one "object of the invention is to provide a dosage system wherein nitroglycerin is delivered to the skin in an amount of from about 0.3 to about 0.7 mg per square centimeter of the [adhesive] layer per 24-hour time interval," '938 patent, col. 4, l. 67, to col. 5, l. 3, and the patent's "DETAILED DESCRIPTION OF THE INVENTION" in which it is stated that "the presently contemplated preferred [patch] sizes are 5, 10, 15, 20, 25 and 30 cm 2," *id.* col. 9, ll. 47-49.

According to Hercon, one arrives at the minimum "pharmaceutically effective amount" by multiplying the lowest stated flux rate (*i.e.,* 0.3 milligrams per square-centimeter per day ("mg/cm 2-day")) by the smallest stated preferred patch size (*i.e.,* 5 cm 2), which yields 1.5 mg/day. Hercon is certainly correct that multiplying flux rates by patch sizes yields daily dosages. However, there is no suggestion in the '938 patent that the full stated range of flux rates can be combined with the full stated range of preferred patch sizes to obtain delivery of "pharmaceutically effective amount[s]" of nitroglycerin. That is, there is no suggestion that each and every combination of flux and patch size from the stated ranges will be effective.

Most importantly, there is no suggestion to use the lowest stated flux rate with the smallest stated preferred patch size. To the contrary, the patent teaches that enough drug be incorporated into even the smallest preferred patch size to provide pharmaceutical efficacy: "The present invention allows for the incorporation of enough pharmaceutically active drug such as nitroglycerin to provide efficacy with a dosage system having

a 5 cm 2 surface area and a thickness of about 3.5 to 4 mm." *Id.* col. 9, ll. 51-55.

Furthermore, Hercon's argument is unconvincing because it is based on using the smallest "preferred" patch size (5 cm 2), whereas the full stated range of patch sizes is 1 to 200 cm 2. *Id.* col. 9, ll. 46-49 ("A surface area in the range of 1 to 200 cm 2 is contemplated and the presently contemplated preferred sizes are 5, 10, 15, 20, 25 and 30 cm 2."). Thus, under Hercon's approach one would actually expect to combine the overall smallest patch size (1 cm 2) with the lowest flux rate (0.3 mg/cm 2-day)—not the smallest "preferred" patch size. This combination would give a 0.3 mg/day patch, which is well below the 2.5 mg/day minimum dosage approved by the FDA. Accordingly, Hercon's assertion that the patent teaches that combining the smallest patch size with the lowest flux rate produces the minimum "pharmaceutically effective amount" is without merit.

Indeed, under Hercon's direction, its expert Dr. Guy testified that the flux rates disclosed in the patent tell one nothing about the meaning of the term "pharmaceutically effective amount":

> Q. Looking at the recitations … relating to flux rate …, does that tell you anything about the meaning of the term "pharmaceutically effective amount" as used in the claims of the '938 patent?
>
> A. No.

Tr. at 1104.

Nor did Key's expert, Dr. John K. Beasley, a Ph.D. in physical chemistry, testify that one skilled in the art would combine the extremes of the disclosed ranges of flux rates and patch sizes to determine the range of amounts represented by the term "pharmaceutically effective amount." Rather than addressing the amounts represented by this term, Dr. Beasley and Key focused on whether the disputed claim clause "sufficient [nitroglycerin] to deliver to the skin a pharmaceutically effective amount of said [nitroglycerin] over a 24-hour time interval" incorporates and therefore requires the written-description stated flux range (0.3 to 0.7 mg/cm 2-day, *see* '938 patent, col. 4, l. 67, to col. 5, l. 3), weight percentage of nitroglyce-

rin in the adhesive layer (20 to 60 percent, *see id.* col. 7, ll. 11–15) and efficacy capability with a small patch (5 cm 2, *see id.* col. 9, ll. 51–55). *See Key Pharm.,* 981 F.Supp. at 308–10. Key apparently sought to incorporate these parameters from the patent's written description into the claim clause to avoid the '959 reference. This attempt was rejected by the trial court. *See id.* We do not address the matter because neither party has raised it on appeal.

In sum, neither Hercon nor Key has pointed to intrinsic evidence establishing the numerical range of amounts represented by the term "pharmaceutically effective amount." Nor have we independently found any. Thus, the resort to and use of extrinsic evidence in this case was entirely appropriate.

Furthermore, we detect no error in the particular extrinsic evidence relied upon by the trial court. To the contrary, it is quite sensible to look to the FDA to determine what amounts are considered pharmaceutically effective. In 1984, the earliest effective filing date for the '938 patent, the FDA considered 2.5 to 15 mg/day to be pharmaceutically effective; in fact, that is the range of dosages approved by the FDA as effective through at least 1993, *see* Notice, 58 Fed. Reg. 38129, 38130–31 (1993).[3] The trial court's determination that this range corresponds to that represented by the term "pharmaceutically effective amount" is logical and appropriate; it does not constitute error. *See Markman,* 52 F.3d at 986, 34 USPQ2d at 1335 ("[I]n construing disputed terms in claim language ... [,] the focus is on ... what one of ordinary skill in the art at the time of the invention would have understood the term to mean.").

■ Lastly on the issue of claim construction, we address Hercon's alternative argument that, if looking to FDA-approved dosages to construe claim 14 is deemed proper, the lower limit of the term "pharmaceutically effective amount" is actually 2.0 mg/day. Hercon arrives at this conclusion by noting that the FDA considers a transdermal patch to be bioequivalent to an approved patch if the amount of drug it delivers is within plus or minus 20 percent of that delivered by the approved patch. According to Hercon, the lower limit should therefore be 20 percent less than the 2.5 mg/day minimum approved dosage—*i.e.,* 2.0 mg/day. However, as concluded by the trial court, there is insufficient evidence in the record to establish that "one of ordinary skill in the art would have so construed 'a pharmaceutically effective amount.'" *Key Pharm.,* 981 F.Supp. at 312.

## C.

■ In view of our affirmance of the trial court's construction of the term "pharmaceutically effective amount," Hercon's assertions that the validity judgment should be disturbed fail. The evidence at trial indicated that, based on mathematically modeling the Example 3 patch of the '959 reference, the Example 3 patch would deliver at most 2.0 mg of nitroglycerin per day, though even this was subject to some doubt. *See id.* at 312–13. Assuming for sake of argument that the Example 3 patch would deliver 2.0 mg/day, there is no anticipation because claim 14, as construed, requires that the patch be capable of delivering at least 2.5 mg/day. *See Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics Inc.,* 976 F.2d 1559, 1565, 24 USPQ2d 1321, 1326 (Fed.Cir.1992) (To establish anticipation a party "must show that each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference....").

We are also unpersuaded by Hercon's further alternative arguments that, even accepting the trial court's claim construction, claim 14 is inherently anticipated or rendered obvious by the '959 reference. Hercon asserts that the Example 3 patch of the '959 reference would merely have to be increased in size by 25 percent to deliver 2.5 mg/day, and that this is inherently taught by, or at least obvious in view of, the '959 reference. However, as the trial court's findings indicate,

3. The FDA's approved range of nitroglycerin dosages is expressed in terms of milligrams per hour ("mg/h"), namely 0.1 to 0.6 mg/h. *See* 58 Fed. Reg. at 38130–31. This corresponds to the 2.5 to 15 mg/day range in that this range of daily dosages converts to an hourly range of 0.104 to 0.625 mg/h when divided by 24 hours.

these assertions lack the kind of support in the record needed for proof of invalidity by clear and convincing evidence. *See Key Pharm.*, 981 F.Supp. at 313.

The trial court did not err in determining that Hercon failed to prove by clear and convincing evidence that claim 14 is either anticipated or rendered obvious by the '959 reference. Accordingly, we affirm the trial court's judgment on validity.

## II.

Turning to the issue of inequitable conduct, the factual prerequisites to inequitable conduct are materiality and intent to deceive. *See Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1556–57, 33 USPQ2d 1496, 1500 (Fed. Cir.1995). The party alleging inequitable conduct must prove these factual predicates by clear and convincing evidence. *See id.* Absent proof of a threshold level of both materiality and intent, there can be no determination of inequitable conduct. *See Halliburton*, 925 F.2d at 1439, 1443–44, 17 USPQ2d at 1838, 1842.

In this case, the trial court found that Hercon proved neither the threshold level of materiality nor intent. *See Key Pharm.*, 981 F.Supp. at 317–19. We review these factual findings under the clearly erroneous standard of Fed.R.Civ.P. 52(a). *See Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir.1988).

Having carefully considered Hercon's various arguments, we acknowledge that the issue of inequitable conduct in this case is a close one. However, the finding on intent in particular depended heavily on the presentation of evidence and witness testimony at trial. The trial court was able to hear these matters first hand and assess witness credibility. Upon the record before us, we cannot say that the trial court's finding on intent is clearly erroneous. Accordingly, while the finding of no materiality is problematic, we need not decide whether that finding was in error, because, given our affirmance of the finding on intent, we must affirm the determination of no inequitable

conduct. *See id.* at 872 & n. 5, 863 F.2d 867, 9 USPQ2d at 1388–89 & n. 5.

## CONCLUSION

The judgment of the trial court is

*AFFIRMED.*

## COSTS

Each party shall bear its own costs.